# EXHIBIT A

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Southern District of New York

| | |
|---|---|
| In Re Ex Parte Application of YOUNGPOONG CORPORATION for an Order Pursuant to 28 U.S.C. § 1782 to Take Discovery for Use in Foreign Proceedings | ) ) ) ) ) ) Civil Action No. |

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

To: PedalPoint Holdings, LLC

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Schedule A

| Place: Jenner & Block, LLP<br>1155 Avenue of the Americas<br>New York, NY 10036 | Date and Time:<br>May 13, 2025 |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

    The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

    *CLERK OF COURT*
                                                OR

_____          _____
*Signature of Clerk or Deputy Clerk*                              *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Youngpoong Corporation  , who issues or requests this subpoena, are:

Brian Fischer, Jenner & Block, LLP, 1155 Avenue of the Americas, NY, NY, 10036, 212-891-1629, bfischer@jenner.com

**Notice to the person who issues or requests this subpoena**
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0 .

I declare under penalty of perjury that this information is true.

Date: _____

*Server's signature*

*Printed name and title*

*Server's address*

Additional information regarding attempted service, etc.:

[Print]  [Save As...]  [Add Attachment]  [Reset]

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
     **(i)** is a party or a party's officer; or
     **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
     **(i)** fails to allow a reasonable time to comply;
     **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
     **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     **(i)** expressly make the claim; and
     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# SCHEDULE A

# **EXHIBIT A**

## **DEFINITIONS**

The definitions and rules of construction set forth in Rule 34 of the Federal Rules of Civil Procedure and Local Rule 26.3 are hereby incorporated into the requests for the production of documents set forth herein. Unless otherwise defined, all words and phrases used herein shall be accorded their usual meaning and shall be interpreted in their common, ordinary sense. As used herein, the words set forth below shall be defined as follows:

1. "Acquisition" refers to the combined purchase by PedalPoint of the majority (73.1%) of Igneo's total shares on July 11, 2022, and the remainder (26.79%) of the shares of Igneo on November 23, 2022, following Board approval, making Igneo a wholly owned subsidiary of PedalPoint.

2. "Agents and Advisors" means the directors, officers, investment bankers, consultants, agents, attorneys, accountants, investigators, representatives, and any other person or entity acting on behalf of PedalPoint or Korea Zinc or subject to their control who prepared documents or information with respect to or advised on the Acquisition, including: JP Morgan Chase Bank; Skadden, Arps, Slate, Meagher & Flom LLP; Rothschild & Co.; and Ramboll Group A/S.

3. "Agreements" means any and all agreements, including but not limited to contracts, side letters thereto, certifications, covenants, indemnification arrangements, forms of release, promises, representations and/or warranties, schedules, unit purchase agreements, and waivers, including drafts and unsigned agreements, and specifically the final and first proposed version of the "Unit Purchase Agreement (Purchase of Class A-2 Units)" executed during the July 2022 transaction, the "Unit Purchase Agreement (Purchase of Class A-1 And Class B Units)"

1

("Tarsadia UPA") executed during the July 2022 Transaction, the "Unit Purchase Agreement (Issuance of Class A-1 Units)," including the "Assignment and Assumption Agreement" enumerating the MCC Contracts, and the "Unit Purchase Agreement (Purchase Of Class A-2 Units)" executed during the November 2022 Transaction, including the schedules and exhibits thereto.

4. "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

5. "Document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term.

6. "ESI" means electronically stored information within the full scope of Rule 34 of the Federal Rules of Civil Procedure.

7. "Igneo" refers to PedalPoint Igneo Holdings, LLC, and its parents (including PedalPoint and Korea Zinc), subsidiaries, including PedalPoint Igneo Technologies, LLC, PedalPoint evTerra Recycling, LLC, Igneo (Georgia), and PedalPoint Igneo IP, LLC, affiliates, and any entities under its control and each of its current and former employees, executives, partners, directors (including any non-executive director), officers, investment bankers, consultants, agents, attorneys, accountants, investigators, representatives, and any other person or entity acting on its behalf or subject to its control, including any other entities in which the Company had an ownership interest at any time from February 4, 2021 to present. Igneo is a Delaware Limited Liability Company and subsidiary of PedalPoint. Igneo was previously known as (among other things) Igneo Holdings, LLC and PedalPoint International, LLC.

8. "Igneo France" refers to Igneo France, SAS, a subsidiary of Igneo with a metal recovery furnace in Isbergues, France, and prior to acquisition was named WEE Metallica SAS.

9. "Igneo Georgia" refers to Igneo (Georgia) LLC, a Georgia Limited Liability Company and subsidiary of PedalPoint Igneo Holdings, registered as WSCR Technologies (Georgia), LLC from its registration on February 5, 2021 to April 23, 2021.

10. "July 2022 Transaction" refers to the purchase by PedalPoint of the majority (73.1%) of Igneo's total shares on July 11, 2022.

11. "Korea Zinc" refers to Korea Zinc Co., Ltd. (a publicly traded company in South Korea, in which Youngpoong has an ownership stake), its parents, subsidiaries, and any entities under its control and each of its current and former employees, executives, partners, directors (including any non-executive director), officers, investment bankers, consultants, agents, attorneys, accountants, investigators, representatives, and any other person or entity acting on its behalf or subject to its control, including any other entities in which the Company had an ownership interest at any time February 4, 2021 to present.

12. "MCC" refers to MCC NFT Holdings, Inc., a New York corporation, and its subsidiary MCC Non-Ferrous Trading LLC, its parents, subsidiaries, and any entities under its control, and each of its current and former employees, executives, partners, directors (including any non-executive director), consultants, officers, agents, attorneys, accountants, investigators, representatives, and any other person or entity acting on its behalf or subject to its control.

13. "MCC Contracts" refers to the 70 Assigned Contracts enumerated in Appendix A and the four Guaranteed Contracts enumerated in Appendix B of the Assignment and Assumption Agreement entered into on July 11, 2022, between MCC, Igneo, and PedalPoint Igneo

Technologies, as well as any other Assigned Contract or Guaranteed Contract that was later disclosed in accordance with Item 71 of Appendix A or Item 5 of Appendix B.

14. "November 2022 Transaction" refers to the purchase by PedalPoint of the remainder (26.79%) of the shares of Igneo on November 23, 2022, making Igneo a wholly owned subsidiary of PedalPoint.

15. "PedalPoint" refers to PedalPoint Holdings LLC, a subsidiary of Korea Zinc and a Delaware Limited Liability Company registered on December 17, 2021, its parents, its subsidiaries, including PedalPoint Igneo Holdings, LLC, PedalPoint Igneo Technologies, LLC, PedalPoint evTerra Recycling, LLC, Igneo Georgia, and PedalPoint Igneo IP, LLC, affiliates, and any entities under its control and each of its current and former employees, executives, partners, directors (including any non-executive director), consultants, officers, agents, attorneys, accountants, investigators, representatives, and any other person or entity acting on its behalf or subject to its control, including any other entities in which the Company had an ownership interest at any time from February 4, 2021 to present.

16. "Related Party" refers to the "related party" (as such term is used in the 2021 audited financial statements of Igneo) that was the source of approximately 85 percent of the revenue of Igneo during the period covered by the 2021 audited financial statements.

17. "Selling Shareholders" means the entities, individual, companies, corporations, and funds that received payment upon the sale of Igneo.

18. The terms "You" or "Your" refer to PedalPoint.

19. "Youngpoong" refers to Youngpoong Corporation, a corporation registered in the Republic of Korea and a shareholder of Korea Zinc.

20. The following rules of construction apply to all discovery requests:

4

a. The terms "all," "any," and "each" must each be construed as encompassing any and all.

b. The connectives "and" and "or" must be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

c. The term "including" is used herein, it shall be construed to mean "including, but not limited to." Whenever the term "includes" is used, it shall be construed to mean "includes, but not limited to."

d. The use of the singular form of any word includes the plural and vice versa.

## INSTRUCTIONS

1. Unless otherwise specifically stated, these requests seek Documents, including Agreements, that were created, modified, used, or in existence during the period from January 1, 2020 to November 23, 2024.

2. The use of a verb in any tense shall be construed as the use of the verb in all other tenses, as necessary to bring within the scope of these requests all documents which might otherwise be considered to be beyond their scope.

3. Unless instructed otherwise, each request should be construed independently and not by reference to any other request.

4. Pursuant to Rule 34 of the Federal Rules of Civil Procedure, your response to each request must either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons. You may state that you will produce copies of documents or of electronically stored information instead of permitting inspection. The production must then be completed no later than the time for inspection specified in the subpoena. A copy of a document that varies in any way whatsoever

5

from the original or from any other copy of the document, whether by reason of stamps, indications of recipient, handwritten notes, marks, comments or attachments to different documents, or for any other reason, shall constitute a separate document and must be produced, whether or not the original of such document is within your possession, custody, or control.

5. If any requested Document is not or cannot be produced in full or is produced in redacted form, produce it to the extent possible, indicating which Document, or portion of that Document, is being withheld and state with particularity the reason or reasons that Document is not being produced in full.

6. Each Request for a Document requires the production of the Document in its entirety, including all pages and attachments or exhibits, without redaction or expurgation, as well as the production of any draft or non-identical versions of the Document and any copies that contain handwriting or other notations. A complete and legible copy may be produced in lieu of producing the Document itself. Absent unusual circumstances, each page of each Document produced shall have a legible, unique page identifier, or "Bates Number."

7. Documents shall be produced as they are kept in the usual course of business or organized and labeled to correspond to the categories in the Requests below. Documents shall be produced with copies of the labels or other identifying marks of the file folder, envelope or other container in which the Documents are kept or maintained by the producing party. Documents attached to each other should not be separated.

8. Documents not otherwise responsive to these Requests shall be produced if such Documents mention, discuss, refer to, or explain the Documents called for by a Request, or if such Documents are attached to Documents called for by a Request and constitute routing slips, transmittal memoranda, or letters, comments, evaluations or similar materials.

9.  ESI shall be produced in searchable electronic format. All responsive ESI shall be produced as single page tagged image file format ("TIFF"). Each TIFF file shall be named with a unique name matching the Bates number labeled on the corresponding page. For each Document, produce an image load file (*i.e.* Opticon file) that contains Document boundaries. For Documents that were originally stored as native electronic files and which have no redactions, produce the extracted, full text from the body of each Document in a separate text file named for the beginning Bates number of the Document. For Documents with redactions, produce OCR text from the redacted image(s). Documents with metadata such as Track Changes or comments should be produced in such a way that these are visible. Documents can be produced electronically by secure file transfer, or, if necessary, via CD-ROMs, DVD-ROMs, portable or external USB drives. Original Document orientation shall be maintained (*i.e.*, portrait to portrait and landscape to landscape) where reasonably possible. Files produced in searchable electronic format should display text and images which would be visible to the reader using the native software that created the Document, including redlines, track changes, comments, hidden slides, hidden rows, hidden columns and/or hidden worksheets. All Microsoft Excel and PowerPoint Documents should be produced in native format with a slip-sheet that states "Produced in Native Format," Youngpoong reserves the right, as needed, to seek production of additional Documents, Communications, or categories of Documents or Communications in native format. All responsive electronic Documents and Communications shall be produced with sufficient metadata in the form of a Concordance delimited .dat file to convey where these items begin and end (including attachments), the original file name, and the original timestamps and attributes, including the following metadata fields: "BEGBATES," "ENDBATES," "BEGATTACH," "ENDATTACH," "to," "from," "cc," "bcc," "subject," "page count," "custodian," "all

custodians," "author," "creation date," "last modified," "date sent," "time sent," "date received," "time received," "application," "file path," "document extension," "file name", "file size" (in bytes), "Parent ID," "Attachment IDs," and "MD5HASH." Documents that constitute spreadsheets, data sets, and like materials, shall be produced in native electronic and fixed format.

10. If you claim the attorney-client privilege, or any other privilege or work-product protection for all or any portion of any Document, produce so much of the Document that is not subject to privilege or work-product protection and provide the following information with respect to each such Document:

      a. the type of Document (*e.g.*, a letter, memorandum, note, etc.);

      b. date of the Document;

      c. the number of pages and attachments;

      d. the identity of each individual who was an author, addressee, or recipient of the Document;

      e. the basic grounds for nondisclosure being asserted, *e.g.*, attorney-client privilege, work product protection, or other privilege claim; and

      f. a brief description of the subject matter of the Document detailed enough to permit analysis of the basis upon which it is being withheld.

11. If, in responding to the Requests, You claim any Definition, Instruction, or Request is ambiguous, such claim shall not be a basis for refusing to respond, and You shall set forth as part of Your response the language deemed to be ambiguous and the interpretation used in responding to the Request.

12. These requests are continuing in nature to the fullest extent required by Federal Rule of Civil Procedure 26(e). If, after producing any materials in response to these requests,

you obtain or become aware of additional responsive materials, you are required to produce such materials by way of a supplemental production.

## DOCUMENTS REQUESTED

1. All Documents You relied upon or considered that concern a basis for, or supported the determination of, the purchase price of the Acquisition, the valuation of Igneo and the business to be acquired, or the decision to approve the Acquisition, including:

   a. all materials delivered or made available to the board of directors of PedalPoint (or to one or more directors thereof) relating to the value of (i) Igneo and its subsidiaries, including Igneo France, or (ii) the MCC Contracts, including any financial statements or financial information (historic or projections) with respect to the revenues, expenses and profits or losses associated with such contracts, whether prepared internally or by Agents and Advisors or received from other third-persons;

   b. all internal memoranda, studies or analyses, presentations, or Communications involving PedalPoint employees, including with Agents and Advisors, and irrespective of whether delivered or made available to the board of directors of PedalPoint, that (i) explain the rationale or strategy for the Acquisition or (ii) support or are inconsistent with the valuation of Igneo (including the transfer of the MCC Contracts);

   c. all supporting materials, including all supporting financial statements and financial information, including projections of revenue, expenses, net income or losses, EBITDA, or otherwise with respect to Igneo and/or the MCC Contracts, and including any pro forma financial statements or information;

d. board resolutions and minutes of the board meetings approving (or previously considering) the July 2022 Transaction or the November 2022 Transaction;

e. legal, accounting, financial, tax, environmental and other due diligence reports relating to Igneo or the MCC Contracts;

f. valuation reports, including any valuation reports from investment bankers involved in the Acquisition, including with respect to the MCC Contracts;

g. any confidential information memorandum ("CIM") prepared by or on behalf of Igneo and delivered to PedalPoint and any other potential buyers;

h. documents concerning goodwill value at Igneo, including reports estimating the recoverable amount of goodwill for Igneo following the July 2022 Transaction and November 2022 Transaction, the proposed and final Purchase Price Allocation (PPA) report contemplated by Section 6.02 of the Unit Purchase Agreement between PedalPoint and Igneo in connection with the July 2022 Transaction, and valuation reports (or financial statements or information) used to recognize or determine goodwill at the time of each Acquisition;

i. Igneo's unaudited financial statements (for the year ended December 31, 2021) made available to and relied upon by PedalPoint in connection with the approval of the July 2022 Transaction, and any interim financial statements or information of Igneo for any quarter, month or other period (or date) ended after December 31, 2021 and prior to the July 2022 Transaction that were delivered to PedalPoint;

11

  j. Igneo's financial statements and information made available to and relied upon by PedalPoint in connection with the approval of the November 2022 Transaction, including financial statements and information obtained by PedalPoint in respect of the MCC Contracts or successor agreements (including associated revenues, expenses, and profits or losses at Igneo) between the time of the July 2022 Transaction and the November 2022 Transaction;

  k. All Documents made available to PedalPoint in any virtual data room hosted by Donnelley Financial, LLC or any other vendor in connection with the Acquisition; and

  l. all financial information (including any financial projections or reports, including any financial advisor valuation reports) relied upon by Igneo to value the company at $27.5 million in connection with the issuance of its convertible promissory notes in May 2021.

2. Each of the MCC Contracts as referenced in the Unit Purchase Agreement (Issuance of Class A-1 Units), dated July 11, 2022.

3. All Documents concerning the value of (or historic or expected revenues, expenses and profitability or losses with respect to) the MCC Contracts, whether prepared by PedalPoint and its Agents and Advisors, Igneo, any Selling Shareholder, or any agent or advisor acting on their respective behalf, including:

  a. consideration paid for the MCC Contracts;

  b. discounted cash flow analyses;

12

      c. pro forma or other financial statements or information with respect to (or including) such contracts;

      d. valuation studies and business assessments; and

      e. Communications by, between or among PedalPoint, Igneo and/or MCC in respect of the assignment of the MCC Contracts to Igneo and their value, including documents sufficient to show which party initiated the proposal to undertake such assignments, the initial value proposed, and the reasons or need for doing so.

4. Any management representation letter (as is customary in connection with U.S. audits) from Igneo to its auditor (and any related Communications) that led to the conclusion that its net operating loss (NOL) was valued at zero ($0) and had no value as reflected on the fiscal year end 2021 audited financial statements.

5. All Documents, including sources and uses financial statements and information, confirming and detailing the actual and specific uses and transfers of the $150 million (less permitted transaction agreement deductions) transferred from PedalPoint to Igneo in connection with the July 2022 Transaction, and how much and where any residual funds are held.

6. Documents sufficient to show the exceptions to the warranties and representations (and other information and disclosures required thereunder) that Igneo and PedalPoint agreed to as part of the July 2022 Transaction, in particular the "Disclosure Schedules" to the July 2022 Unit Purchase Agreement between PedalPoint and Igneo.

7. Documents sufficient to show the dates and recipient(s) of an apparent repayment of a $9,810,215 line of credit identified on the balance sheet (under liabilities) in the 2021 audited financial statements of Igneo, which debt did not appear on the 2022 audited financial statements,

and whether PedalPoint waived the covenant in the Unit Purchase Agreement between PedalPoint and Igneo that did not allow the funds paid by PedalPoint to Igneo (in the July 2022 Transaction) to be used for such purpose.

8. Documents concerning the Related Party, including those sufficient to show the Related Party's identity and the nature of the transactions between Igneo and the Related Party, including:

    a. all Agreements between Igneo and the Related Party; and

    b. financial and other information PedalPoint received about the Related Party and such agreements or transactions with the Related Party as part of due diligence prior to the Acquisition.

9. Documents sufficient to show the identity—including first and last name, last known address, and dates of affiliation—of the following individuals:

    a. all officers and directors of PedalPoint during the course of negotiations of the July 2022 Transaction;

    b. all officers and directors of Igneo and each of its subsidiaries during the course of negotiations of the July 2022 Transaction; and

    c. the directors, officers and beneficial owners of, and advisors to, each of the Selling Shareholders that participated in the Acquisition process or negotiations thereof or communicated with Igneo or PedalPoint in connection therewith.

10. Documents, inclusive of Agreements and Communications, concerning the Acquisition (including the transfer of the MCC Contracts) (i) between PedalPoint, Korea Zinc,

Yun Birm Choi or other directors, and/or Igneo, or (ii) involving PedalPoint and its Agents and Advisors, in regards to:

    a.    whether any transaction consideration (directly or indirectly) flowed to Yun Birm Choi or any director, officer, employee or stockholder of Korea Zinc, or related persons, including friends and family of Yun Birm Choi; and

    b.    initiation of the interest of Korea Zinc in acquiring Igneo Holdings, and who initiated such interest.