1155 AVENUE OF THE AMERICAS, NEW YORK, NY 10036-2711

JENNER&BLOCK LLP

Brian J. Fischer
212.891.1629
BFischer@jenner.com

August 27, 2026
Hon. Jeannette A. Vargas
United States District Court, 500 Pearl St.
New York, NY 10007-1312

Re: ***In re Ex Parte Application of Youngpoong Corporation*** **(1:25-mc-00194-JAV)**

Dear Judge Vargas:

Applicant Youngpoong Corporation moves to compel Respondent PedalPoint Holdings, LLC to collect and produce responsive materials on servers maintained by PedalPoint's parent company, Korea Zinc Company, Ltd. ("Korea Zinc"). The Court previously granted Applicant's motion to compel PedalPoint to produce responsive Korea Zinc-hosted emails for one domain ("pedalpointllc.com") but denied it for the other ("koreazinc.co.kr"), finding Applicant had not shown the latter was "in PedalPoint's possession, custody, or control" (the "Order"). Dkt. 77 at 3.

Since then, new evidence shows that PedalPoint's business records hosted on Korea Zinc's servers are in fact within its "possession, custody, or control". ***First***, PedalPoint has produced "pedalpointllc.com" emails, which are hosted and maintained on Korea Zinc's servers—proving that PedalPoint can obtain documents from Korea Zinc to assist itself in litigation, including "koreazinc.co.kr" emails. ***Second***, post-Order deposition testimony shows that to conduct its business, PedalPoint employees continue to use the "koreazinc.co.kr" domain, depend upon Korea Zinc systems, and regularly communicate with Korea Zinc employees—showing close coordination between PedalPoint and Korea Zinc. Accordingly, Applicant renewed its request to PedalPoint as to the "koreazinc.co.kr" domain and expanded it to encompass all responsive PedalPoint records hosted by Korea Zinc. PedalPoint declined.[1]

## 1. Background

In July 2025, this Court granted Youngpoong's 28 U.S.C. § 1782 application to seek New York-based discovery for use in a shareholder derivative suit in the Seoul Central District Court of Korea that Applicant brought against Korea Zinc's directors. Dkts. 20, 25. There, Youngpoong alleges the directors breached their duty of care by authorizing Korea Zinc to acquire, via PedalPoint, Igneo Holdings LLC ("Igneo") at a grossly inflated price. The acquisition had two steps: PedalPoint acquired 73.21% of Igneo's shares in July 2022 and the remainder in November 2022.

PedalPoint was formed in December 2021 with no email domain of its own; its employees used only "koreazinc.co.kr," hosted on Korea Zinc's servers. PedalPoint continued to rely exclusively on "koreazinc.co.kr" email addresses for PedalPoint's business until around September 2022, when "pedalpointllc.com" was *also* created and hosted by Korea Zinc. Dkt. 76 at 1. PedalPoint did

[1] The parties met-and-conferred on August 24, 2026, at 5:00 pm for 26 minutes, after which they confirmed impasse via email on August 26. The following attorneys attended the meet-and-confer: for Applicant, from Jenner & Block: Billy Goldstein, Julian Buff, and Karen Lou; for PedalPoint, from Quinn Emanuel: Corey Worcester, Linda Moon, Lauren Yeager, and Aslesha Parchure; for both sides, co-counsel from Korean law firms. Applicant disclosed it would seek relief from the Court.

not host a separate domain ("pedalpoint.co") until September 2024, two years after acquiring Igneo. *Id.* at 1. Thus, all PedalPoint email correspondence before, during, and for approximately two months after the critical July 2022 Igneo transaction was only conducted on "koreazinc.co.kr." And in the lead up to and for nearly two years *after* the November 2022 Igneo transaction, PedalPoint business continued to take place exclusively on the two Korea Zinc-hosted email domains, "koreazinc.co.kr" and "pedalpointllc.com." PedalPoint refused to produce emails from either, professing an inability to do so. This led to Applicant's previous letter-motion to compel, which the Court granted for "pedalpointllc.com" but denied for "koreazinc.co.kr." Dkts. 75, 77.

After the Court's Order, PedalPoint did precisely what it had claimed it could not: obtain and produce emails from "pedalpointllc.com," which Korea Zinc has always hosted. If PedalPoint truly were unable to access its records just because Korea Zinc hosts them, it could not have complied with the Order. But it did. And additional new evidence—deposition testimony from PedalPoint (via its corporate representative and CEO, Mark Pope), its CFO (Kevin Hahm), and its General Manager (Janet Ha)—shows that PedalPoint has always closely coordinated with Korea Zinc employees and relied on its systems. This shows that PedalPoint is able to access its own records, even though it relies on Korea Zinc to host them.

## 2. <u>Argument</u>

New evidence obtained since the Court's Order warrants compelling PedalPoint to produce both (i) PedalPoint records available only from the "koreazinc.co.kr" domain; and (ii) additional responsive PedalPoint records hosted by Korea Zinc and used for PedalPoint business, such as those saved in the cloud. This new evidence resolves the Court's previous concerns with ordering PedalPoint to produce its records from the "koreazinc.co.kr" domain.[2] PedalPoint's additional responsive records were not addressed in the Order and are subject to ordinary Rule 45 analysis.

First, new evidence demonstrates that PedalPoint has possession, custody, and "control over documents held by its foreign parent" because it can obtain documents from Korea Zinc to assist itself in litigation. *In re Namenda*, 2017 WL 3822883, at *6 (S.D.N.Y. Aug. 30, 2017). Despite PedalPoint's earlier insistence that it could not access either "pedalpointllc.com" or "koreazinc.co.kr" because Korea Zinc hosts both,[3] it produced the former after the Court's Order. *Compare* Dkt. 76 at 2 (claiming inability to access "pedalpointllc.com" emails), *with* Fischer Aff.

---

[2] To the extent this motion requires revisiting the Order, it is timely because Rule 54(b) permits revision "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). Applicant "could not file for reconsideration until after [it] received the new evidence upon which [it] now [relies]," so brings this motion after the reasonable period required to examine that evidence. *Vicuna v. O.P. Shuman & Sons, Inc.*, 298 F. Supp. 3d 419, 433–34 (E.D.N.Y. 2017) (finding timely reconsideration motion filed over 1.5+ years after ruling). Three "major grounds" can justify reconsideration, including "the availability of new evidence." *DiLaura v. Power Auth. of N.Y.*, 982 F.2d 73, 76 (2d Cir. 1992). New evidence can justify reconsideration when it is "of such importance that it probably would have changed the outcome of the prior ruling." *Vicuna*, 298 F. Supp. 3d at 433.

[3] The Court's Order was based in part on this contention. *See* Order, Dkt. 77 at 3 (Applicant had not "demonstrate[d] that PedalPoint can obtain documents from [Korea Zinc] to assist itself in litigation").

¶ 5[4] (PedalPoint later produced them). PedalPoint's "actual possession" of those documents is "evidenced by their production." *DeSmeth v. Samsung Am., Inc.*, 1998 WL 74297, at *10 (S.D.N.Y. Feb. 20, 1998). When, as here, "it is clear" from subsequent events "that the subsidiary has the practical ability to obtain documents from its parent corporation" for use in litigation, a court may order it to "produce the requested documents." *In re Namenda*, 2017 WL 3822883, at *7.[5] PedalPoint claims that its compliance does not show possession, custody, or control. Fischer Aff. ¶ 14. This is wrong: a production compelled by court order demonstrates PedalPoint's ability to obtain Korea Zinc-hosted documents to "assist itself in litigation." *See Hunter Douglas, Inc. v. Comfortex Corp.*, 1999 WL 14007, at *3 (S.D.N.Y. Jan. 11, 1999) (ability "to comply with a lawful subpoena" is assistance in litigation). If PedalPoint truly could not access these documents, it would have moved for reconsideration of the Order; instead, it complied. That PedalPoint "stored [its] records on its parent's servers does not insulate them from discovery." Dkt. 77 at 2–3.

Second, new evidence demonstrates close coordination between PedalPoint and Korea Zinc such that PedalPoint has the "ready ability to obtain" its own business records hosted by Korea Zinc. *Ferber v. Sharp Elecs. Corp.*, 1984 WL 912479, at *2 (S.D.N.Y. Nov. 28, 1984) (constructive control established by showing "that the subsidiary and parent have worked sufficiently closely in the particular field of endeavor that is the subject of the lawsuit"). So long as close coordination exists between PedalPoint and Korea Zinc, the Court need not find that PedalPoint has "actual managerial power over" Korea Zinc. *DeSmeth*, 1998 WL 74297, at *10. The evidence also shows that information "flow[s] freely between" the two. *In re Namenda*, 2017 WL 3822883, at *6.

Despite PedalPoint's earlier insistence that Korea Zinc-hosted documents do not relate to PedalPoint business, Dkt. 76 at 3, new evidence shows that the companies "worked sufficiently closely" together on the Igneo acquisition, when PedalPoint had no IT systems of its own, that it has "constructive control" over its records that necessarily reside on Korea Zinc servers.[6] *Ferber*, 1984 WL 912479, at *2. Because PedalPoint's first CEO and "project lead" for the Igneo acquisition, Joon-Young Kang, left PedalPoint before Korea Zinc created "pedalpointllc.com," he

---

[4] Applicant is mindful that under Local Civil Rule 6.3, "[n]o party is to file an affidavit unless directed by the court." As Applicant seeks the instant relief due to newly discovered evidence, it respectfully requests that the Court consider the Fischer Declaration and its attached Exhibits as the vehicles for presenting that evidence to the Court. To the extent the Court construes any portion of this motion as seeking reconsideration, Applicant respectfully requests leave to submit the Fischer Declaration and Exhibits.

[5] PedalPoint claims *Namenda* is inapposite because the subsidiary accessed its parent's documents through an "established procedure." Fischer Aff. ¶ 14. But nothing in *Namenda* turns on an "established procedure"; instead, the court held that the subsidiary controlled documents where it could contact the parent to "arrange a search" for documents with only "some burden." 2017 WL 3822883, at *7. PedalPoint's production of the Korea Zinc-hosted "pedalpointllc.com" emails shows the same is true here. Notably, *Namenda* ordered production of parent-hosted materials even though the parent could "decline to produce information," as PedalPoint asserts Korea Zinc has here. *Id.*; Fischer Aff. ¶ 14.

[6] The fact that Applicant seeks PedalPoint's *own records* negates any claim that Korea Zinc is the true target of Applicant's motion, a point the Court has already rejected. Dkt. 77 at 2 ("This is not a case where an applicant seeks a parent company's records through a subpoena directed at the subsidiary."). PedalPoint cannot evade discovery by outsourcing its IT infrastructure during its infancy. Nor would Applicant's separate pursuit of non-PedalPoint's documents—for example, Korea Zinc's records concerning the directors' alleged breach of duty of care—in the Korean proceedings change the analysis.

exclusively used "koreazinc.co.kr" to conduct PedalPoint's business. Fischer Aff. ¶ 11. For several months before the acquisition, Kang was "a person of one" at PedalPoint and had to closely coordinate with Korea Zinc. *Id.* Similarly, until December 2022, now-PedalPoint CFO Hahm worked at Korea Zinc, where he assisted Kang with the Igneo acquisition; despite working at different companies, the two were "colleague[s]," "co-worker[s]," and "on the same team." *Id.* As further detailed in the Fischer Affidavit, for the acquisition, Kang required additional assistance and approval from Korea Zinc personnel involved in decision-making and negotiations. *Id.*

The requested relief is necessary because PedalPoint has not collected its own Korea-Zinc hosted files directly from Korea Zinc's servers, including those from the critical period leading up to and immediately following the Igneo acquisition, obscuring key details of the transaction. Instead, PedalPoint collected "koreazinc.co.kr" emails from some custodians' Korea Zinc laptops, which PedalPoint downloaded "manually," "email-by-email." Fischer Aff. ¶ 6. These manual collections (themselves evidence of PedalPoint's practical ability to access Korea Zinc materials) are no substitute for a full server-side collection. Among other issues, the manual collections may not capture other Korea Zinc network repositories with PedalPoint records, such as the cloud and Teams; even more, PedalPoint admits the manual collections did not capture certain deleted items. *Id.* Further, PedalPoint has not produced *any* custodial collection from its inaugural CEO, Kang. *Id.* PedalPoint now represents that Kang's email account and associated data were deleted and no backup of his emails exists. *Id.* ¶ 7. But that unsworn assertion should not be determinative, and PedalPoint should certify there are no avenues for recovery. Additionally, responsive communications involving Kang may remain in other custodians' Korea Zinc-hosted accounts or repositories, further underscoring the need for a server-side collection.

Further, PedalPoint continues to closely coordinate with Korea Zinc and rely extensively on its systems. PedalPoint General Manager Ha testified she is a Korea Zinc employee on secondment to PedalPoint, where she manages some of its operations on Korea Zinc's "behalf." Fischer Aff. ¶ 12. Ha and Hahm "communicate very heavily with Korea Zinc" to "coordinate different aspects of [their] work." *Id.* As for PedalPoint's dependence on Korea Zinc's systems: both Ha and Hahm rely on their Korea Zinc emails; Ha avoids using her PedalPoint email if she "[can] help it"; at PedalPoint, Ha still uses Korea Zinc's cloud; and Ha *must* use a Korea Zinc profile for mobile email and Teams access. *Id.* And PedalPoint's claimed unity with Korea Zinc for purposes of asserting attorney-client privilege over Ha's communications with Korea Zinc's General Counsel, *see id.* ¶ 13, further demonstrates "close coordination" between the entities. *DeSmeth*, 1998 WL 74297, at *10 (related entities "may not hold themselves out as united for some purposes, but unconnected for others"). In the face of this evidence, PedalPoint cannot rely on bare assertions to deny its "ready ability to obtain" documents hosted by Korea Zinc over which it has constructive control. *Ferber*, 1984 WL 912479, at *2.

Applicant respectfully requests the Court order PedalPoint to collect and produce the PedalPoint materials within its control that are hosted by Korea Zinc and responsive to the Subpoena, Dkt. 4-1, subject to existing discovery parameters, which should need at most minor adjustments (including, if needed, modifications to encompass Kang's files).

Respectfully Submitted,

Brian J. Fischer